1

1

2

3           UNITED STATES DISTRICT COURT
      WESTERN DISTRICT OF WASHINGTON
                 AT SEATTLE

4

SA   FEB - 4 2003

5   UNITED STATES OF AMERICA      )
                                  )                AT SEATTLE
6       Plaintiff,                )        CLERK U S DISTRICT COURT
                                  )    WESTERN DISTRICT OF WASHINGTON
                                  )   BY                      DEPUT
7       vs.                       )   Case CR02-175Z
                                  )   January 30, 2003
8   SEMI OSMAN                    )   10:15 a.m.
                                  )
9       Defendant.                )
                                  )   **ORIGINAL**
10  _____)

11

12

13            TRANSCRIPT OF SENTENCING HEARING
           BEFORE THE HONORABLE THOMAS S. ZILLY
               UNITED STATES DISTRICT JUDGE

14

15  APPEARANCES:

16  On Behalf of the United States:   ANDREW HAMILTON
                                      Attorney at Law
17
    On Behalf of the Defendant:       ROBERT LEEN
18                                     Attorney at Law

19  Also Present:                     Paula Yuhasz
                                      Probation Officer
20

21
    Caroline R. Castle
22  Official Court Reporter
    (206) 553-1899                    CR 02-0175 #00000051
23

24

    Proceedings recorded by mechanical stenography; transcript
25  produced by computer.

 1    Seattle, Washington; Thursday, January 30, 2003; 10:15 a.m.

 2          THE COURT:  Would the clerk please call the calendar.

 3          THE CLERK:  Case CR02-175Z, United States versus Semi

 4    Osman.

 5       Counsel, please make your appearances.

 6          MR. HAMILTON:  Good morning, Your Honor.  Representing

 7    the United States, Andrew Hamilton.

 8          MR. LEEN:  Good morning, Your Honor.  Robert Leen

 9    appearing on behalf of the defendant.

10          THE COURT:  This is a continuation of the sentencing

11    hearing that we started on January 24th.

12       The government ready to proceed with the evidentiary

13    hearing?

14          MR. HAMILTON:  Yes, Your Honor.  We would call

15    Special Agent Darrick Smalley.

16       (The witness is sworn.)

17          THE WITNESS:  I do.

18          THE CLERK:  Take the stand, please.  Will you state

19    your name for the record and spell your last name, please.

20          THE WITNESS:  My name is Darrick D. Smalley.

21    D-a-r-r-i-c-k D. S-m-a-l-l-e-y.

22          DARRICK D. SMALLEY, GOVERNMENT'S WITNESS, SWORN

23                        DIRECT EXAMINATION

24    BY MR. HAMILTON:

25    Q   What is your occupation?

1   A    I'm a Senior Special Agent with the United States

2   Immigration and Naturalization Service.

3   Q    And where are you currently assigned?

4   A    I'm assigned as a member of the Joint Terrorist Task Force

5   here in Seattle, Washington.

6   Q    How long have you been a member of the INS?

7   A    I've been a member of the INS since June of 1988.

8   Q    Have you participated in an investigation of a defendant by

9   the name of Semi Osman?

10  A    Yes, I have.

11  Q    And are you familiar with the records and files contained in

12  this particular investigation?

13  A    Yes, I am.

14  Q    For purposes of this hearing, can you identify Mr. Osman?

15  Is he in court today?

16  A    Yes, he is.  He is the defendant sitting next to Mr. Leen.

17  Q    Can you explain to the Court what is meant by an A-file?

18  A    An A-file is a record of an alien, someone who is not a

19  citizen of the United States, although sometimes that A-file

20  becomes part of a citizen's record.  It's a file of the

21  Immigration and Naturalization Service's interactions with

22  aliens.

23  Q    And are you familiar with Mr. Osman's A-file?

24  A    Yes, I am.

25  Q    Special Agent Smalley, do you know where Mr. Osman

1   originally was born?

2   A    In Sierra Leone, West Africa.

3   Q    And what were the circumstances surrounding his first entry

4   to the United States?

5   A    He entered in the United States on--as--carrying a British

6   passport, December 22nd of 1988 at New York City.

7   Q    And did he have any type of visa that permitted him this

8   entry?

9   A    It was a visa waiver, as I recall.  Or could have been a

10  B-2 visa.  Just a moment.

11       He entered as a B-2 visitor.

12  Q    What does that mean?

13  A    It's a visitor for pleasure.  Typically, people that are

14  admitted as B-2 visitors are admitted to the United States for a

15  period of six months.

16  Q    If a person enters the U.S. with a B-2 visa and they stay

17  past the six months, what is their status in the United States?

18  A    Well, they'd be illegally residing in the United States, if

19  they had not gotten an extension.  They would be placed into

20  removal proceedings, if they were encountered by any of the

21  officers in the Immigration Service.

22  Q    Does the A-file for Mr. Osman indicate whether or not he

23  ever obtained a visa extension?

24  A    No, it does not.

25  Q    Now, I want to direct your attention to July 25th of 1990.

1   What event, if any, occurred involving Mr. Osman on that day?

2   A    On July 25th of 1990, Semi Osman married Curly Britt, a

3   United States citizen, in Maryland.

4   Q    And is that this woman's actual name:  Curly, last name

5   Britt?

6   A    Originally she was born Curly Edwards, I believe.  And I

7   think she had her name changed when she was about 30 years old.

8   Q    And then following this marriage in July of 1990, what, if

9   anything, did Mr. Osman do as far as the INS?

10  A    Well, he filled out a Form I-485, which is an application

11  for permanent residence, to change his status from his previous

12  status.  He also filled out a Form I-130, which is a petition

13  for an alien spouse.  And those were then filed with the

14  Immigration and Naturalization Service.

15  Q    What effect does a marriage have upon an alien's immigration

16  status?  If an alien marries a U.S. citizen, what effect does

17  that have?

18  A    Well, immigration is based usually on family reunification.

19  In many cases, people have to wait many years for a visa to be

20  available.  When you marry a United States citizen, there is no

21  waiting for a visa number to be available with the Department of

22  State.  You're immediately issued a visa number which allows you

23  to become a permanent resident immediately.

24  Q    And what happens as far as a person's status in the United

25  States once this marriage occurs and they file this paperwork?

1   A    Once they file it and that petition is approved, they

2   are--initially before their approval, they're given at least

3   status because they've filed this document.  It makes them

4   legal.

5        Once that petition has been approved, it grants them legal

6   status in the United States as a permanent resident.  And it

7   begins the process for them to become a naturalized United

8   States citizen, if they so choose to do so.

9   Q    And how long does it take following this type of marriage

10  for a person to become naturalized?

11  A    Well, it's actually a faster process by marrying a United

12  States citizen.  Because it only takes you three years before

13  you can apply for naturalization, whereas most other people have

14  to wait for five years.

15  Q    Now, are you familiar with a statement made by Curly Britt,

16  who married Mr. Osman in 1990?  A statement that was taken on

17  October 1st of 1991?

18  A    Yes, I am.

19  Q    And do you know where this particular statement was taken of

20  Ms. Britt?

21  A    I believe it was taken by agents at the Philadelphia office

22  of the Immigration and Naturalization Service.  And it was

23  actually executed, I believe, at her residence in Philadelphia,

24  Pennsylvania.

25  Q    And in this statement did Ms. Britt make statements

1  concerning her marriage to Semi Osman?

2  A    Yes, she did.

3  Q    What did she say?

4  A    Well, she stated that they got married July 25th of 1990 in

5  Elkton, Maryland, that they never had sex together and that she

6  married him as a favor, so he could get his Green Card and stay

7  in the United States.  He did give her some money, but the money

8  really wasn't important.  She did this as a favor to him.

9  Q    Did Ms. Britt, in this statement, implicate a person as far

10  as arranging this sham marriage?

11  A    Yes, she did.  It was Patrick Sesay.

12  Q    Now, are you familiar with a statement made by Patrick Sesay

13  in March of 1993?

14  A    Yes, I am.

15  Q    And again, where did this statement take place at?

16  A    This statement was executed at 1600 Callow Hill Street in

17  Philadelphia, Pennsylvania.

18  Q    And this was a sworn statement?

19  A    Yes, it was.

20  Q    And this statement occurred after Mr. Sesay was advised of

21  his Miranda rights and waived those rights?

22  A    That's correct.

23  Q    And what did Mr. Sesay say in the statement concerning the

24  marriage of Mr. Osman to Curly Britt?

25  A    That he arranged the sham marriage between Semi Osman and

1   Curly Britt.  He charged Semi $400 to arrange the marriage, so

2   that he could get his Green Card.  Semi paid Mr. Sesay $200 of

3   the $400.  Mr. Sesay introduced Curly Britt to Semi Osman at her

4   house on Cambridge Street, and Donald Colburn took Curly and

5   Semi Osman to Elkton, Maryland to fill out the marriage

6   application and for the marriage ceremony.

7       Patrick Sesay also took Curly and Semi to an attorney by the

8   name of Bruce O'Neill at his office.  And Mr. Sesay says he has

9   not seen Semi Osman since he took them to the attorney.

10  Q   I should ask you, this investigation occurring in

11  Philadelphia that led to these sworn statements was an

12  investigation of whom?

13  A   It was actually an investigation of the marriage arranger,

14  Patrick Sesay.

15  Q   And was he, in fact, convicted for arranging marriages?

16  A   Yes, he was.

17  Q   Where did this conviction occur?

18  A   In the Eastern District of Pennsylvania, the United States

19  District Court.  On September 21st of 1995, Mr. Sesay was

20  convicted of 18 USC, Section 371, which was conspiracy to commit

21  offense against the United States.  Also of Title 18 United

22  States Code, Section 1001, false statement to an agency of the

23  United States.  And Section 2, aiding and abetting.

24  Q   And do the documents from the Eastern District of

25  Pennsylvania reveal how many sham marriages Mr. Sesay was

1   charged with?

2   A    Yes.   There was 22 marriages.

3   Q    Finally, Special Agent Smalley, was Mr. Osman interviewed on

4   May 17th of 2002?

5   A    Yes, he was.

6   Q    And do you know who conducted this interview?

7   A    I conducted an interview, along with Special Agent Kim

8   Highfield of the Naval Criminal Intelligence Service.

9   Q    And this interview occurred where?

10  A    At the district offices of the United States Immigration and

11  Naturalization Service here in Seattle, Washington.

12  Q    And before the interview started, was Mr. Osman advised of

13  his Miranda warnings?

14  A    Yes, he was.

15  Q    And are those warnings actually printed on the statement

16  form?

17  A    Yes, they are.

18  Q    And did Mr. Osman indicate whether or not he understood

19  those rights?

20  A    Yes, he did.   He attached a signature with a date and time.

21  Q    And did he waive those rights?

22  A    He certainly did.

23  Q    And did he waive that in writing?

24  A    Yes, he did.

25  Q    What, if anything, during this interview did Mr. Osman say

1    to you concerning his marriage to Curly Britt?

2    A    He admitted that he did--let's see.  He arranged the

3    marriage through Patrick Sesay, paid Patrick Sesay money for

4    arranging the marriage.  He also paid Curly Britt in

5    appreciation for her helping him to become a permanent resident

6    alien.  He knew that it was wrong, and he hated the fact that he

7    was marrying her.  He never consummated the marriage through

8    sexual intercourse, and they were soon divorced.

9    Q    And did he indicate why he went through this marriage?

10   A    Yes, he did.  So he could become--so he could stay in the

11   United States legally.

12            MR. HAMILTON:  Your Honor, I don't have any further

13   questions.

14            THE COURT:  Cross of the witness?

15            MR. LEEN:  Thank you, Your Honor.

16                       CROSS-EXAMINATION

17   BY MR. LEEN:

18   Q    Special Agent Smalley, Mr. Osman has an A-file?

19   A    Yes, he does.

20   Q    And he's given a number?

21   A    Yes, he is.

22   Q    Do you have Mr. Osman's number?

23   A    Just a moment.  A29526092.

24   Q    A29526--I'm sorry?

25   A    --092.

1   Q    Now, when it came--Mr. Osman originally applied--the

2   procedure is that Curly Britt will file a petition on behalf of

3   her alien spouse, who would be Semi Osman?

4   A    Well, when you say "the procedure," Curly Britt filed a

5   petition on behalf of her alien spouse.

6   Q    All right.  Let me get into it this way.

7        This is a common way in which aliens apply for resident

8   alien status, to be married to a United States citizen?

9   A    Yes.  If they're already in the United States, first they

10  need to adjust their status.  And also, that status is

11  determinate on their marriage to a United States citizen.

12  Q    So after the fraudulent marriage took place, which--the

13  marriage took place for the purpose of filing this petition.

14  That's your Service's position.  Is that correct?

15  A    Well, the marriage--they were legally married in the state

16  of Washington, to my knowledge.

17       But the purposes of that marriage and the filing of those

18  documents with the Immigration Service was for a fraudulent

19  application.

20            THE COURT:  You said "the state of Washington."  You

21  meant Maryland, did you?

22            THE WITNESS:  Yes I did, Your Honor.  I'm sorry.

23  Q    (BY MR. LEEN)  And so when did you become aware of this?

24  When did it come to light that Curly Britt had entered into this

25  marriage for this purpose and Semi Osman had entered into the

1   marriage for this purpose?  When did INS find out about that?

2   A   INS actually became aware of this sometime after August of

3   2000.

4   Q   Did the agency take a statement from Curly Britt at some

5   earlier time?

6   A   The agency did.  Yes, indeed.

7   Q   And when did it?

8   A   As I earlier testified, the agents from Philadelphia took a

9   statement in 1991.  I believe that's October 1st.

10  Q   All right.  And was that, then, put into Mr. Osman's

11  permanent alien file?

12  A   It was put into Mr. Osman's permanent alien file, but I have

13  no idea when it was put into Mr. Osman's permanent alien file.

14  Q   Well, if a statement is taken by an INS official and there's

15  an A-number on it, do you put it into the file so that you can

16  index it?

17  A   If I have possession of the file, I would put it into the

18  file.

19  Q   Is there some kind of entry made on the computer for the

20  person's A-number that there's a sham marriage that's been

21  discovered?

22  A   I don't know of any computer system that existed at that

23  time, no.

24  Q   Okay.  Because I'm wondering--in December of 1992, Mr. Osman

25  had another petition for alien relative filed on his behalf by

1    his wife, Pamela Harris.

2    A    Correct.

3    Q    Is that correct?

4    A    Yes, it is.

5    Q    And that was dated December 8th, 1992, that he applied for

6    resident alien status as a spouse of a United States citizen.

7    A    I believe that's correct.  I can check my file.  And I do

8    know that that was in a different district.

9    Q    All right.  And it has the same A-number?

10   A    I believe so.

11   Q    And it was acted upon, and he was given resident alien

12   status?

13   A    Yes, he was.

14   Q    All right.  The original petition with Curly Britt, now that

15   came to light because of an investigation of a man named Patrick

16   Sesay?

17   A    That's my understanding.  Yes, it is.

18   Q    And he was--he was the type of guy who knew how to

19   manipulate the INS system for people who wanted to get resident

20   alien status.

21   A    Well, he was convicted of crimes that relate to those kinds

22   of offenses.  Yes, indeed.

23   Q    Now, he gathered a number of women, didn't he, maybe 5, 10,

24   15 women to participate in this conspiracy?

25   A    I don't know what you mean by "gathered women."  He helped

1   facilitate a number of fraudulent marriages.

2   Q    And the investigation showed that, in fact, there was like

3   at least 22 marriages that he arranged.

4   A    Yes, that's correct.

5   Q    And all of the applicants, the alien applicants, were

6   Sierra Leone men who had just come to the country, were here a

7   relatively short period of time and he found wives for them?

8   A    I don't know if they're all from Sierra Leone or not.

9   Q    Well, there was a prosecutorial memorandum prepared by the

10  United States Attorney's Office regarding the prosecution of

11  Patrick Sesay.  You're aware of that, aren't you?

12  A    Yes, I am.

13  Q    And that was in March of 1995, that the decision was made

14  whether to prosecute Mr. Sesay for all of the events that took

15  place in 1990, 1991?

16  A    I don't know if a decision was made at that time or not.  I

17  know that Mr. Sesay was eventually convicted, so there was

18  probably some decision at some point to proceed with the

19  prosecution of Mr. Sesay.

20  Q    And all of the women who entered into this, these fraudulent

21  marriages, they were allowed to withdraw their petition.  They

22  weren't prosecuted, were they?

23  A    I don't know what happened to all the women that were

24  involved in these cases.

25  Q    Well, you're aware that the recommendation in the file for

1  at least Curly Britt is to allow her to withdraw the petition?

2  A    I don't recall that.  Where are you finding that in the

3  file?

4  Q    You see that part of the investigatory note?

5  A    It says voluntary withdrawal of the petition.  But this is

6  dated March 24th of 1993.  And the petition, as I understand,

7  was actually abandoned after Semi Osman and Curly Britt found

8  out that Patrick Sesay was under investigation.  So by this

9  time, Semi Osman was already married to Pamela Jill Harris.

10 Q    Wasn't Curly Britt allowed to withdraw her petition?  She

11 was never prosecuted for the fraudulent petition?

12 A    I think that's two different statements.  I don't know

13 whether or not she's ever been prosecuted, and I don't know

14 whether or not she's ever been allowed to withdraw her petition.

15 I show nothing in the A-file that shows that she withdrew her

16 petition.

17 Q    Okay.  One second.

18     Isn't it true that Mr. Osman abandoned his petition by not

19 showing up at an interview?

20 A    It appears that way.

21 Q    Isn't that what the document says?

22 A    Can you tell me which document you're referring to?

23 Q    Sure.  There's a document that's called--it sets an

24 appointment.  I don't know what the document's called.  It's

25 back in '91 that these letters were sent to Semi Osman, and they

1   were telling him that his application or petition will be deemed

2   abandoned unless he responds to this request.

3   A    I believe that's the Immigration Service, then, telling the

4   petitioner, Semi Osman that his petition will be assumed to be

5   abandoned if he doesn't respond.

6   Q    And that was--and it was deemed abandoned before he applied

7   through the marriage of Pamela Harris.  Is that correct?  It was

8   abandoned.  The former petition of Curly Britt was abandoned,

9   and then he later applied for lawful resident alien status as

10  the spouse of Pamela Harris.  Correct?

11  A    Yeah.  I think that would be correct.

12  Q    All right.  Now, at the time that Mr. Osman was arrested in

13  this case in May of 2002, INS had Mr. Osman listed in what kind

14  of status in the United States?

15  A    Well, at that time Mr. Osman was a permanent resident, based

16  on his marriage to Pamela Jill Harris.

17  Q    All right.  So if someone looked at the--if someone was

18  asked, "What is the status of this individual," that's what INS

19  would say?

20  A    Well, I think probably what somebody would say if they

21  looked at the entire A-file is that Mr. Osman had been granted

22  permanent resident alien status, and a further review of the

23  file shows that he had been involved in marriage fraud.

24  Q    So is there a procedure that can take place to adjust that

25  status because of a prior fraud?

1    A    To adjust that status?

2    Q    Well, I mean, let's say that INS found out about the fact

3    that a lawful resident alien had a prior fraud in his--in his

4    application process.  Is there a way that you can act on that so

5    that you can take away the lawful resident alien status?

6    A    Not only is there a way to do that; this happened in this

7    case, where Semi Osman was arrested on the 17th of May and put

8    into immigration proceedings based on the fraudulent marriage.

9    They were seeking to revoke his status as a permanent resident

10   alien.

11   Q    And is there a notice you have to issue procedurally to do

12   that?

13   A    Yes.  It's called a Notice to Appear.

14   Q    And when did the Notice to Appear get issued?

15   A    I believe that was on the 7th of May.

16   Q    On May 7th?

17   A    I believe so.

18   Q    Could you look?

19   A    I'm not sure if it's contained in this file that I have

20   here.  It may be contained in the original A-file, and I don't

21   have a complete copy.

22   Q    Oh.  At--

23        MR. LEEN:  Let me see.  I may have one other point,

24   Your Honor.

25        That's all I have.  Thank you.

1           THE COURT:  Further questions?

2           MR. HAMILTON:  No questions, Your Honor.

3           THE COURT:  Let me ask a few questions.

4                              EXAMINATION

5    BY THE COURT:

6    Q    You indicated that he entered the United States on a British

7    passport on 12/22 of '88, New York City.

8    A    That's correct.

9    Q    And he had a B-2 visitor visa.  And you said that the

10   standard length is six months.  Do we know what his period of

11   being a visitor here was?

12   A    Well, actually, that passport was reported stolen and he

13   received a replacement passport.  It's actually probably in the

14   immigration--there's a system called the Non-Immigrant

15   Information System which would show the length of admission,

16   And I'm not sure if I have a copy of that.  I can look.

17   Q    Well, is there a time after his entry into the United States

18   when he became an unlawful visitor in this country as a result

19   of overstaying his visa?

20   A    Well, as soon as his length of admission was up, he was

21   illegally in the United States.  And many times that's why

22   individuals get married to United States citizens, is so they

23   can immediately become legalized in the United States.

24   Q    So my question to you is:  When did he become illegally here

25   after entering?

1   A    Just a moment, Your Honor.

2        I don't have a copy of the Non-Immigrant Information System

3   printout which would actually show his admission dates.

4   Q    You indicated he entered the country on December 22nd of

5   1988.

6   A    Right.   That's correct.

7   Q    How long did he remain, if you know, in a legal status here

8   as a visitor?

9   A    He would have remained in status as a visitor until the

10  point that his visa admission ran out.   When you--

11  Q    All right.   And when was that?   That's what I'm trying to

12  understand.

13  A    I would have to determine that from the records from the

14  Non-Immigrant Information System computer.

15  Q    So the answer is you don't know.

16  A    I am not positive.

17  Q    All right.   As I understand it, he applied for permanent

18  residency in November of 1990 as a result of his marriage to

19  Curly Britt.

20  A    Correct.

21  Q    And is it correct that that application was subsequently

22  abandoned?

23  A    He never showed up for--I know there was at least three

24  call-in letters that he failed to show up for.   I believe the

25  Service indicated that they would be considering his application

1   abandoned if he didn't show up.

2   Q   All right.  And you can't tell us today whether, when he

3   applied for permanent residency as a result of that fraudulent

4   marriage, he was legally in the United States or not.

5   A   I'm sorry.  Would you repeat the question?

6   Q   Yeah.  You can't tell us today whether or not, when he

7   applied for that permanent residency as a result of that

8   marriage, he was legally here.

9   A   I do know I can tell you that he was illegally in the United

10  States at that point, because I do know from reviewing the

11  records in the past that there was no extension which allowed

12  him to be in the United States on the day he filed that--

13  Q   So sometime prior to November 16th of 1990, we can say that

14  he was illegally here.

15  A   Yes.

16  Q   All right.  Now, as a result of the application for

17  residency as a result of that marriage to Curly Britt, the

18  government did not change his status.  Is that right?

19  A   Following his marriage to Curly Britt, no.  They did not

20  change his status on his marriage to Curly Britt, because they

21  failed to show up for their appointments with the Immigration

22  and Naturalization Service.

23      So he continued to be out of status, because he actually had

24  no status at that point.

25  Q   Was he legally a resident of the country as a result of

1   filing the application?

2   A    No.

3   Q    Now, he apparently entered into a second marriage with a

4   Pamela Jill Harris in February of 1992?

5   A    That's correct, Your Honor.

6   Q    And in connection with that, he filed a petition or Harris

7   filed a petition to classify alien relative?

8   A    Yes, she did.

9   Q    And he filed and signed an INS Form I-485, application for

10  permanent residence?

11  A    That's correct, Your Honor.

12  Q    And am I correct that in December of '92, that request was

13  approved and he was granted status as a lawful permanent

14  resident?

15  A    Yes, he was.  That's December 8th, 1992 in the Baltimore

16  district.

17  Q    Is that his status today?

18  A    It is his status at this point, until he goes before an

19  immigration judge and that judge makes a determination based on

20  the Notice to Appear that's been filed in which we have charged

21  him with fraudulently obtaining his permanent residency.

22  Q    So can we then summarize by saying that he entered the

23  country legally under a visitor visa, that he stayed for--longer

24  than the visa period, we don't know exactly what that visa

25  period was, and that in December of '92 he was granted a lawful

1   permanent resident status and he has that status today?

2   A    Yes.   And actually on that petition, the I-130 which was

3   filed in conjunction with his marriage to Pamela Jill Harris, he

4   states--or she states that he lost his I-94.   And the I-94 is

5   the entry record.   It's a small white card placed in a passport

6   with a date stamp of when a person entered and how long they

7   were admitted until.

8        And it states that he arrived on 12/22/88, and under the

9   next line it says:   Date authorized stay expired or will expire.

10  And it shows that on February 22nd, 1989, his length of

11  admission had expired.

12  Q    Give me that--February 22nd--

13  A    February 22nd, 1989.

14  Q    That would only be three months after he entered the

15  country.

16  A    That's correct.

17  Q    So I thought you said that normally it was six months or

18  longer.

19  A    It is six months.   He could have entered, actually, as a

20  visa waiver as a holder of a British passport.   Which doesn't

21  mean that you need to have a visa to enter the United States;

22  that you can show up with a passport that doesn't have a visa in

23  it, and you enter the United States.

24  Q    Can you tell me today under oath that his lawful status

25  ended on February 22nd, of '89?

1   A    Well, his own words.  Yes, indeed, it did.

2   Q    When you say "his own words"--

3   A    This is part of his application he filed with the

4   Immigration Service.

5   Q    And that's what he said.

6   A    That's what he said.  And his passport he reported lost or

7   stolen--he reported it stolen.  So we actually don't have the

8   physical evidence of that passport with that I-94 card in it.

9   Q    Well, the statute that I must interpret today defines a

10  prohibited person as one who is an alien illegally or unlawfully

11  in the United States.

12       As of today, he's legally in the United States.  Is that

13  right?

14  A    He is the holder of a permanent resident card.  He has been

15  placed in proceedings.  Those proceedings have not ended due to

16  his incarceration here.

17  Q    Is he lawfully here?

18  A    Your Honor, I can't interpret the law.  All I can do is give

19  you the facts.

20  Q    All right.

21            THE COURT:  Lawyers have any questions as a result of

22  my questions?

23            MR. HAMILTON:    No, Your Honor.

24            MR. LEEN:   May I ask two questions, Your Honor?

25            THE COURT:  Certainly.

1              RECROSS-EXAMINATION

2    BY MR. LEEN:

3    Q    Agent Smalley, at the time that Mr. Osman applied for--or

4    excuse me.  At the time that Pamela Harris applied for the

5    petition for alien relative, did--they did disclose the prior

6    marriage to Curly Britt, did they not?

7    A    As I recall, yes, indeed, they did state that there was a

8    previous marriage.  There's nothing stated on that application

9    that it was a fraudulent marriage or that it was a marriage with

10   the intent to gain immigration status.

11   Q    And a copy of the divorce decree was appended to the

12   application.

13   A    Yes, it was.  It's contained within the A-file.

14            MR. LEEN:  No further questions.  Thank you.

15            THE COURT:  Thank you.  You may step down.

16        All right.  Government have any further witnesses?

17            MR. HAMILTON:  No, Your Honor.

18            THE COURT:  Government wish to argue with respect to

19   the status of the defendant for purposes of the prohibited

20   person?

21            MR. HAMILTON:  Your Honor, I think we're bound by the

22   plea agreement, and so we have nothing to say at this time.

23        Thank you.

24            THE COURT:  Mr. Leen?

25            MR. LEEN:  Thank you, Your Honor.

1    Your Honor, I think that the term "prohibited person" turns
2  on status.  And that is one of the very rare things that
3  is--really, you don't go behind.  Just like you don't go behind
4  whether a person's a convicted felon.  The defense wouldn't be
5  allowed to say:  Well, we would like to establish the facts of
6  that conviction to show that you really should not deal with it
7  in terms of what it does to the defendant's guidelines.

8    I don't think you go behind the status that he's a resident
9  alien, at least not when it's for the purposes of sentencing
10  like this.  If it were an element of an offense, that might be a
11  different--that might be a different ballgame.  But when you're
12  talking about sentencing and he says he's a lawful resident
13  alien and the government says he's a lawful resident alien, I
14  think the Court needs to give due deference to that status.

15    It's not a factual thing; it's a status.  It's conferred by
16  the executive.

17    And so we ask that you follow the plea agreement and not try
18  to determine how an administrative law judge would resolve this.
19  Because courts and administrative agencies are much, much
20  different in their decision-making process.  I wish sometimes
21  administrative agencies were more like the courts, but they're
22  not.

23    And in this case he has not lost that status.  It has not
24  gone through that procedure.  It would be premature for the
25  Court to say that he's a prohibited person.

1    Thank you.

2          THE COURT:  Let me ask the parties whether there are

3    any objections to the facts stated in the pre-sentence report.

4          MR. LEEN:  One second, Your Honor.

5          Yes, Your Honor.  We agree with the facts.

6          THE COURT:  And it goes without saying, but let me ask.

7    Did the defendant receive a copy of the pre-sentence report and

8    sentencing recommendations?

9          MR. LEEN:  He did, Your Honor.

10         THE COURT:  All right.

11         Well, I'm going to make the following--what I'm going to do

12   for purposes of sentencing, now whether I'll actually sentence

13   him today or not I'll wait and hear from the lawyers on how they

14   wish--how they think I should proceed.  But the issue of his

15   guideline range is something that we started to determine at the

16   original hearing and needs to be determined now.

17         First I'm going to adopt as facts the facts stated in the

18   pre-sentence report.

19         And for purposes of the issue before the Court on this

20   prohibited person status, the Court specifically notes that

21   the--and finds that the defendant did enter the United States

22   lawfully with a British passport on December 22nd of 1988.  He

23   had a visitor visa, and by his own admissions he apparently was

24   lawfully in the United States until February 22nd of 1989.

25         Thereafter he, by his own admissions and by the facts stated

1   in the pre-sentence report, entered into a fraudulent marriage
2   with one Curly Britt.  And he paid someone to arrange the
3   marriage.  He paid Curly Britt to participate in the marriage.
4   The marriage was never consummated, and it was procured by
5   fraud.

6       The defendant did apply for a permanent residency in
7   November of 1990 based on that fraudulent marriage.  He filed an
8   I-485 application for permanent resident.  But no action was
9   taken as the defendant did not follow up and appear for an
10  interview, and no status change occurred as a result of that
11  fraudulent marriage.

12      That marriage by law ended in divorce granted by the
13  Superior Court of the District of Columbia in 1991.

14      In February of 1992 he entered into a second marriage to a
15  United States citizen, Pamela Jill Harris.  And in April Harris
16  filed a petition to classify alien relative for the issuance of
17  an immediate visa.  Osman executed a Form G-325 and signed an
18  application Form I-485 to become a permanent resident.

19      The defendant did not notify the INS that his previous
20  marriage had been a fraudulent marriage, and on December 8th of
21  1992 the INS Form I-485 was approved by the INS and he was
22  granted the status of a lawful permanent resident by the INS.

23      The Court finds that although he was divorced from Pamela
24  Harris in March of 1996, there was and has never been to this
25  date any change in his legal status in the United States.  That

1  is, that from approximately December of 1992 he has had the
2  legal status of a lawful permanent resident granted by the INS.
3      Now, that status may change.  The INS is in the proceedings
4  of--has issued notice and will hereafter at some point no doubt
5  have a hearing.  And the Court is not going to speculate as to
6  what the outcome of that hearing may be.

7      The question is what's his status today.  And more
8  importantly, what was his status at the time he committed the
9  instant offense.  He has pled guilty to possession of a firearm
10 with an obliterated serial number, and those events occurred in
11 May of 2002 when a search warrant was executed at his apartment
12 in Tacoma.

13     If he was a, quote, prohibited person under 18 USC,
14 Section 922(g)(5), he would be assessed two additional points
15 for guideline computations.  A definition of "prohibited person"
16 refers to someone being an alien--he's obviously an alien--who
17 is illegally or unlawfully in the United States at the time of
18 the offense.

19     Because the defendant was granted legal permanent status by
20 the INS and because that status has not changed, for purposes of
21 sentencing the Court finds that he was not and is not a
22 prohibited person under the law as of the time he committed the
23 offense.  The adjustment of two points will not be assessed, and
24 therefore the guideline computations for purposes of sentencing
25 will be as follows.

1    The base offense level is a Level 12.  Because there was a

2    firearm involved, two points are added to go to a Level 14.  I

3    believe two points should be taken from the 14, would be a

4    Level 3 (sic).  I know the pre-sentence report assessed--took

5    three points off.  But--because of the level, only two points

6    are permitted.  And his Criminal History Category is zero

7    criminal history points, Category I.  His guideline range is

8    8 to 14 months.

9        Any objection to the Court's computation of his guidelines

10   for purposes of sentencing?

11               MR  LEEN:  I'm sorry.  The Court said 12--I think you

12   misspoke.  I think he's a Level 10, Your Honor, which is 6 to

13   12--

14               THE COURT:  Just a moment.

15               MR. LEEN:  --based on your finding.

16               THE COURT:  Well, the base offense level is--I believe

17   is a 12, is it not?

18               MS. YUHASZ:  Yes, Your Honor.  However, I think the

19   issue here--and I'm looking for it--is we had applied a specific

20   offense characteristic because of the obliterated serial number.

21   And I think that there was an application note that if it's

22   found that the defendant is not a prohibited person, that that

23   enhancement does not apply.

24               THE COURT:  So the two points does not apply.

25               MS. YUHASZ:  I believe so.

1          THE COURT:  Government agree?

2          MR. HAMILTON:  Yes, Your Honor.

3          MR. LEEN:  So it's a four-point difference, actually.

4          THE COURT:  All right.  So base offense level is 12,

5     two points off for acceptance is a 10, Criminal History

6     Category I:  6 to 12 months.

7        Is that where we are?  Any objection to those calculations?

8          MR. HAMILTON:  No, Your Honor.

9          MR. LEEN:  No, Your Honor.

10         THE COURT:  All right.  Now, does the government and

11    the defendant wish to proceed to sentencing now?

12         MR. HAMILTON:  Will the Court hear from me?

13         THE COURT:  Yes.

14         MR. HAMILTON:  Your Honor, we again renew our request

15    that sentencing be put off until April.

16       And as I have stated, this is something that the parties

17    agreed to at the time of the plea.  If the Court was to sentence

18    Mr. Osman in April to credit for time served at that point, he

19    will have served 11 months, which is less than the high end of

20    this particular guideline range.

21       Mr. Leen asked the Court to uphold the plea agreement when

22    it came to the issue about whether or not it's a prohibited

23    person.  We ask the Court to uphold the same plea agreement on

24    this matter of the continuance.  I submit that it's in the

25    government's best interests.  It's in Mr. Osman's best

1   interests.  There are reasons which we have documented before

2   the Court in our previous pleas.

3      Mr. Osman struck a deal that had certain benefits to him,

4   and he was agreeable to this provision that we obtain a

5   continuance.  And the agreement was he contemplated serving a

6   full year.  We're not asking that.  We just ask that it be

7   continued to April.

8      Thank you.

9            THE COURT:  Mr. Leen?

10           MR. LEEN:  Yes, Your Honor.

11     Your Honor, it is true the defendant did agree to

12  continuances up to one year without conditions as a condition of

13  the plea agreement.

14     And I think what happened here--because it's untoward for me

15  to not keep our end of the bargain when the government's kept

16  its end of the bargain.  But I think it's important to

17  understand what's happened here.

18     At the time that the plea was taken--and I think the

19  government even asked for a sentence to be set out commensurate

20  with the idea that they were going to be continuing to work on

21  this matter and we shouldn't rush to sentence, since we had

22  agreed--the defense had agreed that the government could have a

23  year to prepare for that day in their discretion, as long as it

24  was reasonably exercised.

25     And the Court said:  Well, I think I want to set the

1   sentencing in October.  Because, you know, I'm not bound to

2   necessarily abide by that.  And I might feel that a sentence of

3   less time is appropriate, and I don't want to--I don't think

4   that the government's desire to continue sentencing should

5   override that feeling, if that's the way I want to sentence him.

6      And I think that that--we welcome the Court thinking that

7   way.  But Mr. Osman has always felt that we really shouldn't be

8   agreeing to continuances of the sentencing without coming to the

9   Court and letting the Court make that decision.  And that's

10   really what drives our position today.

11      If you think that Mr. Osman should receive less than a--near

12   the high end as a sentence, then I think that that should

13   motivate you to sentence today.  If you think that you're going

14   to sentence nearer the high end, then I guess the same--the

15   government's interests in delaying sentencing should prevail.

16      I think that Mr. Osman should be sentenced to eight months,

17   actually.  And I think that he should--he has an INS hold, and

18   they'll probably continue to hold him at the FDC.  So I don't

19   think his situation is going to change much.

20      But I think it's important to state that we did agree to a

21   continuance.  And the government upheld its end of the bargain

22   completely, and we're going to uphold our end of the bargain

23   completely too.  So I'm not objecting to the continuance of

24   sentencing.  I'm just saying there are some arguments and

25   reasons why we're here today earlier than when we bargained for.

1    Thank you, sir.

2         THE COURT:  Well, the defendant has agreed to cooperate

3    with the government.  He's agreed to testify at a trial set for

4    March 31st before Judge Coughenour in a different criminal case.

5    The defendant did agree that his sentencing date may be delayed

6    based on the United States' need for his continued cooperation,

7    and he agrees not to object to any continuance of the sentencing

8    date.  The Court's sentence will be--and whether the Court

9    determines that a departure is appropriate.  But all of those

10   things will have to await his completion of his cooperation with

11   the government, at least with respect to that trial.

12        I'm going to continue the sentencing date until sometime in

13   early April after he has testified in that case.

14        Madam Clerk, may we have a new sentencing date?

15        (Discussion off the record.)

16        THE COURT:  We'll set it for Friday, April 11th at

17   1:30.  Anything further to come before the Court this morning?

18        MR. HAMILTON:  No, Your Honor.

19        MR. LEEN:  No, Your Honor.

20        (The proceedings concluded at 11:04 a.m.)

21

22

23

24

25

```
 1                          CERTIFICATE
         I, Caroline R. Castle, court reporter for the United States
 2   District Court in the Western District of Washington at Seattle,
     was present in court during the foregoing matter and reported
 3   said proceedings stenographically.
         I further certify that thereafter, I, Caroline R. Castle,
 4   have caused said stenographic notes to be transcribed via
     computer, and that the foregoing pages are a true and accurate
 5   transcription to the best of my ability.
         Dated this 4th day of February, 2003.
 6
 7                              Caroline R. Castle

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                           INDEX
                                                     PAGE
 2    WITNESSES:
      For the Government:
 3    DARRICK D. SMALLEY
          Direct Examination by Mr. Hamilton          2
 4        Cross-Examination by Mr. Leen              10
          Examination by the Court                   18
 5        Recross-Examination by Mr. Leen            24

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```